# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| MARITZA DEL CARMEN VALLE; | *Case No.* _____ |
| FERNANDO FERNANDEZ SEGURA, | Agency File Nos. A 203 601 133 |
| *Petitioners,* | A 090 076 984 |
| *v.* | **PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241; REQUEST FOR OSC AND FOR ORDER DIRECTING SERVICE** |
| RANDY TATE, *in his official capacity as Warden*, Joe Corley Detention Facility, The GEO Group, Inc.; | |
| PATRICK CONTRERAS, *in his official capacity as Houston Field Office Director,* United States Department of Homeland Security; | |
| CHAD WOLF, *in his official capacity as Acting Secretary*, United States Department of Homeland Security | |
| WILLIAM P. BARR, *in his official capacity as Attorney General,* U.S. Department of Justice | |
| *Respondents* | |

## INTRODUCTION

**1.** This is a petition for a Writ of Habeas Corpus filed on behalf of Petitioners Maritza Del Carmen Valle (hereinafter Ms. Valle) and Fernando Fernandez Segura (hereinafter Mr. Fernandez) to remedy their unlawful detention.

Both Petitioners suffer from medical conditions that make them uniquely vulnerable to COVID-19. They have also been denied access to necessary medication, further compromising their immune systems. Petitioners are currently detained in Joe Corley detention Facility in Conroe, Texas where they are both currently detained in DHS custody in a facility operated by GEO Group Inc.

2. Petitioner Maritza Del Carmen Valle (hereinafter "Petitioner"), a native and citizen of El Salvador, entered without inspection on May 26th near or around Otay, California. Petitioner indicated her intent to apply for asylum and was then unlawfully placed into the "Migrant Protection Protocols" (MPP) or "Remain in Mexico Program." Petitioner had her Merits hearing on October 11th, 2019 where the Immigration Judge denied her application for Asylum, withholding of removal and protection under the Convention Against Torture. Petitioner was then transferred to Otay Mesa Detention Center pending appeal. In this time, Petitioner retained the undersigned counsel and the appeal has been filed. Petitioner has since been transferred to the Joe Corley Detention Facility in Conroe, Texas where she currently is detained in DHS custody in a facility operated by GEO Group Inc. There is no hearing pending in the instant case.

3. Petitioner Fernando Fernandez Segura (Hereinafter Mr. Fernandez) entered the United States lawfully in 1987 and obtained his green card in 1990. Mr. Fernandez has been with his wife Ms. Juliet Vasquez Saldana for 32 years and together they have 2 U.S. Citizen children. Mr. Fernandez has lived in the same

home for two decades. Driven by a series of business misfortunes and the needs of his family, Mr. Fernandez attempted to and was caught by CBP trafficking marijuana across the Border. Mr. Fernandez pled guilty to one count of importation of controlled substances in violation of 8 USC §§ 952, 960, in exchange for cooperating with the investigation. After completing his sentence, petitioner was transferred to DHS custody and has remained detained since then. Mr. Fernandez was issued an NTA on November 14th, 2018 and indicated his intention to apply for withholding of removal and relief under CAT. On August 27th, the Immigration Judge (IJ) denied his request for relief and on February 12th, the BIA dismissed Mr. Fernandez's appeal. On February 12th, 2020, Mr. Fernandez filed a Petition for Review with the 9th Circuit regarding the Board's Decision denying his appeal. On February 6th, 2020 Mr. Fernandez filed a motion for a stay of removal.

4.     The Petitioners bring this habeas petition under the Suspension Clause, U.S. Const. art. I, § 9, cl. 2, to challenge their continued prolonged unlawful detention by Respondents as well as their continued detention during the COVID-19 pandemic.

5.     Petitioners' constitutional rights have been violated on account of acts taken by the Respondents in disregard of substantive and procedural due process rights mandated by the fifth amendment. In addition to being detained for an unconstitutionally prolonged period of time --11 months in the case of Ms. Valle and 17 months for Mr. Fernandez -- the Petitioner also moves the court to issue an

emergency order against the Respondents ordering their immediate release as both are medically vulnerable to the COVID-19 infection.

6. While detained, Ms. Valle has been deprived of the treatment needed to address her stress induced facial paralysis. Recently, and in Respondent's custody, Ms. Valle had the flu and a fever. She was not allowed any medication for her fever. The psychological stress of detention compounded with her inability to access the proper treatment for her conditions makes her immune system heavily compromised. Were Ms. Valle to contract COVID-19, she would be in grave danger of dying before her proceedings have reached a conclusion.

7. Mr. Fernandez suffers from diabetes, depression, and herniated disks. He is also 55 years old. Mr. Fernandez has been on disability since 2003 due to a 2001 work related accident. Mr. Fernandez has been taking prescribed medication to help him with the herniated disks and depression, but both have been made inaccessible during his 17-month detention, making him critically vulnerable to the COVID-19 pandemic.

8. Respondents' continued detention of the Petitioners under unsafe conditions in violation of public health recommendations is unconstitutional. The Joe Corley Detention Facility has had 12 confirmed cases as of May 5th, 2020[1],

---

[1] https://www.houstonchronicle.com/neighborhood/moco/news/article/Conroe-detention-facility-reports-14-COVID-19-15248900.php

putting the lives of Petitioners squarely at risk of contraction and death. The petitioners have both already been made medically vulnerable through Respondents' lack of adequate medical care and are now being housed in inherently contagious quarters, exposed to the virus. This high probability of contraction while detained for their removal purposes is in clear violation of Respondents' Rights to Due Process.

9. On March 11, 2020, the World Health Organization declared the global outbreak of COVID-19, the disease caused by a novel coronavirus, a pandemic. Since then, in the span a little more than a month, confirmed cases of the disease in the United States surged from just over a thousand to over a million as of April 30, 2020. Over 60,000 of those people have died.

10. As of April 14, 2020, the first immigrant detainee in a Texas detention facility tested positive for COVID-19, even though now there are widespread reports of the Virus in South Texas Detention Facility, El Paso Processing Center and the Joe Corley Detention center in question.[2,3] Perhaps equally concerning is the mismanagement by ICE and its contractors in handling the Virus, as ICE has been caught underreporting the virus' effect on its

---

[2] https://www.expressnews.com/news/us-world/border-mexico/article/Immigrants-in-detention-near-San-Antonio-fear-15241307.php

[3] https://kfoxtv.com/news/local/eight-detainees-at-el-paso-processing-center-in-ice-custody-test-positive-for-covid-19

employees.[4]

**11.**    This mismanagement contributes to public health considerations that extend beyond the walls of the Corley Detention Facility.  In Pearsall Texas, every single case of Corona that has reached the citizens ICE and DHS are sworn to protect, stemmed from the detention center.[5] These risks are mirrored by the Stewart Detention Center located in Lumpkin, Georgia, where more than 40 employees have tested positive for COVID-19[6].

**12.**    Otay Mesa Detention Center in San Diego serves a chilling warning to anyone entrusted with the safety and well-being of detainees. After leading the nation in COVID-19 cases, the Facility recorded its first death on May 6th, 2020[7]. This rapid spread of the virus and subsequent death of a detainee within these facilities demonstrates two things: 1. Respondents are not properly implementing the CDC's guidelines; and/or 2. the CDC's guidelines are insufficient to keep

---

[4] https://www.texasobserver.org/ice-immigrant-detention-centers-coronavirus-positive/

'[5] https://www.ksat.com/news/local/2020/05/05/every-positive-covid-19-case-in-pearsall-traced-to-immigration-detention-center-officials-say/

[6] https://www.wabe.org/more-than-40-employees-at-ga-immigrant-detention-center-test-positive-for-covid-19/?fbclid=IwAR1QIxSLiuLhbleZDaX0H5uPCoXXPW_mqPrfUykpANbf-3c4nToaOBBU8E8

[7] https://www.sandiegouniontribune.com/news/immigration/story/2020-05-06/first-ice-detainee-dies-from-covid-19-after-being-hospitalized-from-otay-mesa-detention-center; https://www.washingtonpost.com/national/coronavirus-ice-detainee-death/2020/05/06/3be3852e-8ff2-11ea-9e23-6914ee410a5f_story.html

detained people safe and healthy during a contagious deadly viral pandemic.

**13.** There is no specific treatment, vaccine, or cure for COVID-19, and no one is immune. The only way to prevent the chance of serious illness or death from COVID-19 is to practice scrupulous hygiene and social distancing – two things which public health experts maintain are not possible within the detained setting. The United States now has the most confirmed COVID-19 cases in the world, even though access to testing remains limited.

**14.** The COVID-19 pandemic has fundamentally changed most aspects of everyday life, with public and private institutions dramatically altering daily operations. In contrast, ICE has failed to meaningfully respond to protect the health and safety of people in its custody.

**15.** COVID-19 is a highly contagious virus causing respiratory distress, fever and potentially death. As stated above, the COVID-19 pandemic has infiltrated the detention centers – with respect to the facilities it has not yet infiltrated, given the nature and operation of these facilities and the woefully inadequate precautions of ICE, it is only a matter of time before all detention facilities are overtaken by this virus.

**16.** Because the CDC-recommended "social distancing" practice is inherently impossible in the detention centers – and because COVID-19 has proven so incredibly contagious – COVID-19 will imminently spread like wildfire within the detention centers resulting in varying levels of illness, including many deaths.

**17.** There is no vaccine or cure for COVID-19 and it can be deadly. COVID-19 is highly contagious and has a mortality rate ten times greater than influenza. These factors, combined with the circumstances under which Respondents are continuing to detain Petitioners (namely, in close quarters without providing masks or gloves or hand sanitizer), place the Petitioners' health and safety at risk and mitigate in favor of the Petitioners immediate release.

**18.** Courts across the state and country are ordering the release of people in civil immigration custody in recognition of the threat posed by COVID-19. E.g., *Dada v. Witte,* No. 1:20-cv-00458-DDD-JMP, ECF No. 17 (W.D. La. Apr. 30, 2020); *Alcantara v. Achambeault et. Al,* No. 3:20-cv-00756-DMS-AHG, ECF No. 38 (S.D. Ca, Apr. 30, 2020); *Gayle v. Michael Meade et al,* No. 1:20-cv-21553-MGC ECF No. 76 (S.D. Fl Apr. 30 2020); *Coreas v. Bounds et al.,* No. 8:20-cv-00780-TDC, ECF No. 87 (Md, Apr. 30 2020);. *MALAM V. ADDUCCI,* NO. 2:20-CV-10829-JEL-APP. Dkt. No. 23 (E.D. Mich. Apr. 6, 2020); *Xochihua-Jaimes v. Barr*, No. 18-71460, 2020 WL 1429877 (9th Cir. Mar. 24, 2020); *Castillo v. Barr*, No. CV2000605TJHAFMX, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Fraihat v. Wolf*, No. ED-CV2000590-TJH, ECF No. 18 (C.D. Cal. Mar. 30, 2020*); Hernandez v. Wolf*, No. 20-cv-00617, ECF No. 17 (C.D. Cal. Apr. 1, 2020); *Velaszquez v. Wolf*, No. 20-cv-00627, ECF No. 32 (C.D. Cal. Apr. 2, 2020); *Basank v. Decker*, No. 20-cv-02518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *Thakker v. Doll*, No. 20-cv-00480, ECF No. 47 (M.D. Pa. Mar. 31, 2020); *Calderon Jimenez*

*v. Wolf*, No. 18-cv-10225, ECF No. 507 (D. Mass. Mar. 26, 2020). These orders recognize that "[t]he risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious" and that "public health authorities predict [COVID-19] will especially impact immigration detention centers." *Basank*, 2020 WL 1481503, at *6; *Xochihua-Jaimes*, 2020 WL 1429877, at *1.

**19.** Activists and public health experts all across the country, including in Conroe, are calling for the release of detainees in immigrant detention centers. Ranit Mishori, senior medical advisor for Physician for Human Rights, said people simply cannot protect themselves in detention centers. "The only defenses that we have against coronavirus — social distancing, meticulous hygiene practices, self-quarantine - are not possible in immigration detention centers." Releasing detainees during a global pandemic "will save the lives of immigrants, of facility staff, of vendors, their families and the broader public in the surrounding communities," Mishori said.[8]

**20.** Petitioners have retained the undersigned counsel and respectfully submit they will demonstrate constitutional violations of law by Respondents by way of this petition.

## CUSTODY

**21.** Petitioners are currently in the physical custody of Respondents,

---

[8] https://www.keranews.org/post/el-paso-leaders-call-release-nonviolent-detainees

namely, specifically in the custody of ICE. Petitioner is detained at the Joe Corley Detention Facility in Conroe, Texas. This facility is run by The GEO Group, Inc. which contracts with Respondents to do so. Petitioner is under the direct control and custody of Respondents and Respondents' agents.

## PARTIES

**22.** Petitioner Maritza Del Carmen Valle (hereinafter "Ms. Valle"), a native and citizen of El Salvador, entered without inspection on May 26th, 2019 near or around Otay, California. Petitioner is currently in the physical and legal custody of Respondents at the Joe Corley Detention Facility in Conroe, Texas.

**23.** Petitioner Fernando Fernandez Segura (hereinafter Mr. Fernandez), a native and citizen of Mexico, first entered the United States lawfully in 1987. Mr. Fernandez has been in DHS custody since November of 2018. Mr. Fernandez was ordered removed on August 27th, 2019. He has a pending stay of removal with the 9th Circuit. Petitioner is currently in the physical and legal custody of Respondents at the Joe Corley Detention Facility in Conroe, Texas.

**24.** Respondent WILLIAM BARR is sued in his official capacity as the Attorney General of the United States. In that capacity, he has responsibility for the administration and enforcement of the immigration laws pursuant to 8 U.S.C. § 1103 and is a legal custodian of Petitioner.

**25.** Respondent Chad Wolf is the Acting Secretary of DHS, an agency of

the United States with several components responsible for enforcing United States immigration laws pursuant to 8 U.S.C. § 1103. Respondent Wolf is a legal custodian of Petitioner. He is sued in his official capacity.

26. Respondent Patrick Contreras is the Houston Field Office Director for ICE Enforcement and Removal Operations ("ERO"), a federal law enforcement agency within the U.S. Department of Homeland Security ("DHS"). The Houston Field Office is responsible for, among other things, carrying out ICE's immigration detention operations at the Joe Corley Detention Facility. Respondent Patrick Contreras is a legal custodian of Petitioner. He is sued in his official capacity.

27. Respondent Randy Tate is the Warden of the Joe Corley Detention Facility. Respondent Randy Tate is the immediate physical custodian of Petitioner. He is sued in his official capacity.

## JURISDICTION

28. This action arises under the United States Constitution and the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101 *et seq.* ("INA"). This Court has jurisdiction over this petition for writ of habeas corpus under 28 U.S.C. § 2241 (habeas corpus, which provides that "[w]rits of habeas corpus may be granted by . . . the district courts." This Court also has jurisdiction under 28 U.S.C. § 1331 because this is a "civil action arising under the . . . laws . . . of the United States." (federal question). Furthermore, this Court has jurisdiction under 28 U.S.C. § 1361 (mandamus); art. I, § 9, cl. 2 of the U.S. Constitution ("Suspension Clause");

U.S. Const. amend. V (the Due Process Clause of the U.S. Constitution); and jurisdiction over declaratory judgment, brought pursuant to 28 U.S.C. §§ 2201-02. Petitioner is presently in custody under color of the authority of the United States, and such custody is in violation of the Constitution, laws, or treaties of the United States. *See Zadvydas v. Davis*, 533 U.S. 678 (2001). This Court may grant relief pursuant to 28 U.S.C. §§ 2201-02, 28 U.S.C. § 2241, and the All Writs Act, 28 U.S.C. § 1651.

**VENUE**

**29.** Venue in this District is proper under 28 U.S.C. § 1391(e)(2) because the Officer in Charge who makes custody decisions in Petitioner's case is located within this judicial district and Petitioner is detained within this judicial district. Moreover, venue is proper under § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this District.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

**30.** Exceptions to the exhaustion requirement are appropriate where the available administrative remedies either are unavailable or wholly inappropriate to the relief sought, or where the attempt to exhaust such remedies would itself be a patently futile course of action." *Hinojosa v. Horn*, 896 F.3d 305, 314 (5th Cir. 2018); (quoting *Fuller v. Rich*, 11 F.3d 61, 62 (5th Cir. 1994) (per curium)); see also *Alexis v. Sessions*, CIVIL ACTION No. H-18-1923, at *10 (S.D. Tex. Nov. 13, 2018). Furthermore, an action is futile if the BIA's view is "already set" or the

outcome is "very likely." *El Rescate Legal Servs. , Inc. V. Exec Office of Immigration Review,* 959 F.2d 742, 74748 (9th Cir. 1991) (holding petitioner need no exhaust administrative remedies to challenge a translation policy which the BIA had announced and affirmed).

**31.** Ms. Valle has been in detention since May 26th, 2019, more than 11 months. On October 11th, 2019 her merits claim was denied, and she was transferred from detention pursuant to MPP to Otay Mesa Detention Center. A timely appeal was filed with the BIA an Immigration Judge. On April 3rd, an Immigration Judge conducted an initial custody redetermination hearing pursuant to section 236 (a) of the Immigration and Nationality act (INA).

**32.** Despite Ms. Valle's clear and convincing evidence proving her identity and that she was not a danger to the community, the Immigration judge denied bond on April 9th, 2020. Remedies available to petitioner are in the form of her BIA appeals and a possible redetermination hearing pursuant to 8 C.F.R. § 1003.19(e). Given the outbreak of the COVID-19, both those forms of remedy are subject to delay so severe, that the relief offered by the Government is futile in the instant case.

**33.** The administrative remedy held out by the government in the case of Petitioner Ms. Valle – i.e. a successful appeal of either case, of a subsequent redetermination hearing pursuant to 8 C.F.R. § 1003.19(e) – is illusory. In light of the global problems presented by COVID-19, the idea that Petitioner will receive a

timely response to her bond appeal filing is unlikely, whereas the possibility of contracting COVID-19 and suffering undue harm is extremely likely. Per the guidelines set forth in 8 C.F.R. § 1003.19(e), Petitioner would have to prove that her circumstances had materially changed. Because the basis of the appeal is the legal standard the Immigration Judge adhered to, it is very likely that Petitioner would be denied bond. Thus, because of the wholesale delays in BIA procedure and the likelihood of a subsequent bond denial, the administrative remedies proffered by the government are illusory and the requirement should be waived.

**34.** While the Petitioner can submit a parole request to Respondent ICE, there is no mechanism – other than the instant habeas petition – ensuring that the Petitioner's urgent request will be granted or even responded to.

**35.** Mr. Fernandez has been in detention since November 14th, 2018, over 17 months at the time of filing. On August 27th, 2018, the Immigration judge (IJ) denied his request for relief under withholding of removal and CAT. Mr. Fernandez filed from EOIR-26 and supporting brief indicating his intent to appeal the decision of the IJ. On February 12th, 2020 the Board dismissed the appeal. There is currently a Petition for Review pending and motion for a Stay of Removal pending with the 9th Circuit

**36.** As an alien seeking admission at a designated port of entry is classified as an "arriving alien" pursuant to 8 C.F.R. 1001.1(q), immigration judges

are divested from jurisdiction relating to Petitioner's custody redetermination.[9] See *Matter of Oseiwusu*, 22 I&N Dec. 19 (BIA 1998). As such, the sole administrative remedy offered by the government—i.e., being released from custody pursuant to a parole request —is illusory and thus exhaustion is not necessary. "Exceptions to the exhaustion requirement are appropriate where the available administrative remedies either are unavailable or wholly inappropriate to the relief sought, or where the attempt to exhaust such remedies would itself be a patently futile course of action." *Hinojosa v. Horn*, 896 F.3d 305, 314 (5th Cir. 2018); (quoting *Fuller v. Rich*, 11 F.3d 61, 62 (5th Cir. 1994) (per curium)); see also *Alexis v. Sessions*, CIVIL ACTION No. H-18-1923, at *10 (S.D. Tex. Nov. 13, 2018).

37.    Petitioner did, however, request parole. If a noncitizen establishes a credible fear, "[p]arole . . . may be considered . . . in accordance with section 212(d)(5) of the Act and [8 C.F.R.] § 212.5." 8 C.F.R. § 208.30(f). Noncitizens detained for further consideration of an asylum claim may generally be "parole[d] into the United States . . . for urgent humanitarian reasons or significant public benefit." INA §§ 212(d)(5)(A), 235(b)(1)(B)(ii), and § 235(b)(1)(B)(iii)(IV). Despite Mr. Fernandez's extensive family ties to the United States, his ownership of property, his dying wife and father and extensive and documented medical conditions, Mr. Fernandez's parole request, his parole request continues to sit on

---

[9] Nevertheless, Petitioner's prior immigration counsel did file a "bond" motion with the El Paso Immigration Court, however, it was denied due to the Court's lack of jurisdiction. *See* Exhibit B

the desk of ICE officers with no decision being given.

**38.** Furthermore, Mr. Fernandez submitted his appeal to the BIA seeking administrative remedy for the removal order in his case. The BIA dismissed this case on February 12th, 2020 rendering a final administrative order in his case. Even if exhaustion were not waived due to futility, Mr. Fernandez can demonstrate he amply exhausted all remedies available to him in pursuit of just relief.

**39.** To date, the Petitioners are still in custody and will continue to languish in custody until they are irrevocably harmed by COVID-19 due to the lack of adequate safety precautions and day-to-day operations and practices of a detention center.

**40.** Thus, the only remedy for Petitioners' continued unlawful prolonged detention – and the only way to save their lives and the lives of other detainees and ultimately lives in the Conroe community – is by way of this constitutional habeas challenge.

## PROCEDURAL AND FACTUAL BACKGROUND

**41.** Petitioner Maritza del Carmen Valle was born April 19th, 1982 in El Salvador. Petitioner has fled religious and other persecution. Specifically, Petitioner fled for her religious activism against criminal activity.

**42.** On May 26th, Ms. Valle entered the U.S. without inspection or admission at or near Otay Mesa, California. Shortly thereafter she was apprehended by DHS. At this point Ms. Valle indicated her fear of persecution and/or torture in

her home country of El Salvador, and her intention to apply for asylum relief. In the normal course of action DHS would subject Ms. Valle to INA section 235 expedited removal proceedings. Since she had expressed a fear of persecution, Ms. Valle would be referred to a trained Asylum Officer within U.S. Citizenship and Immigration Services (USCIS), as required by federal laws.

43. Instead, bypassing the entirety of this long-established process, DHS chose to place Ms. Valle in ordinary "Section 240(a)" removal proceedings in front of an immigration judge. Defendants then immediately returned Ms. Valle to Mexico to await her future immigration court hearings under the "Migrant Protection Protocols" (MPP) or "remain in Mexico" program. Ms. Valle remained detained in Mexico pursuant to 8 C.F.R.

44. On October 11th, 2019, the Immigration Judge conducted Ms. Valle's individual merits hearing, in which Ms. Valle was not represented by counsel, and after the Petitioner had been transported from Tijuana, Mexico, at the San Ysidro Port of Entry to the aforementioned hearing in San Diego. Following Petitioner's testimony, the Immigration Judge denied her application of asylum, withholding of removal and protection under the Convention Against Torture.

45. Ms. Valle was detained in Otay Mesa Detention Center immediately following the afore-mentioned decision by the Immigration Judge. Ms. Valle was then transferred to Joe Corley Detention Center in Conroe, Texas where she has remained until present time.

**46.** Ms. Valle filed her notice of appeal of the Immigration Judge's decision in her merits hearing with the Board on November 12, 2019. Her brief was submitted January 8th, 2020 by undersigned counsel.

**47.** Counsel submitted a Motion for Custody Redetermination on March 23rd, 2020. The hearing was set to April 3rd, 2020. In this hearing, Ms. Valle was denied bond on the sole basis that she has "lost her case." Ms. Valle was denied bond despite the lack of clear and convincing evidence that she is a flight risk, or a danger to the community and in spite of the burden of proof being on the DHS to prove those factors.

**48.** In response to the above-referenced custody redetermination denial, Counsel filed an appeal on this decision on April 28th, 2020. This appeal was filed on the grounds that the IJ ignored BIA precedent and that his findings were based solely on the fact that Petitioner had lost her asylum claim. Further grounds included this misplacement of the burden of proof on Ms. Valle.

**49.** Ms. Valle has been in detention for over 11 months (e.g. since May, 26th 2020.

**50.** Ms. Valle has a well-founded fear of future persecution by the criminal organizations of El Salvador on account of her religious convictions and membership in the particular social group of religious activists teaching young children religion.

**51.** The persecution must be inflicted under government sanction,

including persecution by groups "the government is unable or unwilling to control." *See Adebisi v. INS*, 952 F.2d 910, 914 (5th Cir. 1992) (quotation marks omitted). Here, the Petitioner was persecuted – via physical attacks and threats on her life – by governmental actors on account of her religion and membership in particular social groups.

**52.**　As such, Ms. Valle has a well-founded fear of future persecution due to more than one protected ground. Relocation is also impossible for the Ms. Valle and the burden would be on Respondents to show she can both safety and reasonable relocated. *Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 445 (5th Cir. 2001) ("We have held that '[w]hen a party seeking asylum demonstrates that a national government is the persecutor, the burden should fall upon the INS to show that this government's prospective actions are truly limited to a clearly delineated and limited locality and situation, so that the applicant for asylum therefore need not fear a likelihood of persecution elsewhere in the nation.'")

**53.**　As stated above, Ms. Valle's request for custody redetermination was denied by Immigration Judge on April 9th despite the fact that she has no criminal record, is an asylee escaping criminal persecution on account of her Christian faith, has a sponsor here in the U.S. ready and willing to sponsor her through the pendency of her removal proceedings, and that the DHS attorney argued nothing but that Ms. Valle "lost her case."

**54.**　Ms. Valle has suffered stress-facial-paralysis and has been deprived

of the medication and vitamins needed to address her condition. She caught the flu while subjected to MPP and has already had a fever while in the Corley Detention Facility. Her condition is tentative at best and psychological stress weakens her immune system and her ability to fight COVID-19.

**55.** Mr. Fernandez is a 55-year-old citizen and national of Mexico. He seeks relief from removal for withholding of removal and under the Convention Against Torture.

**56.** Mr. Fernandez first entered the United States lawfully in 1987 and obtained his green card in 1990. He and Ms. Juliet Vasquez Saldana have been together for roughly 32 years. Together they have two U.S. citizen children, Fernando Fernandez Jr., 29 years old, and Juliet Fernandez Vasquez, 24 years old. Prior to being detained, Mr. Fernandez and his wife shared their home with their 29-year-old son and 24-year-old daughter, her husband and their child. Mr. Fernandez's identity is shaped in part by his core value of being a provider for his family. Indeed, he fell into a depression after going on disability in 2003 as a pillar of his identity, being his family's provider, was usurped by his medical condition.

**57.** Mr. Fernandez's desire to ensure that his children had a form of income that was more reliable than what their father could provide propelled him to invest in and start a trucking business. The business plan did not go as originally planned and the debts soon started to pile on. This eventually took a toll on Mr. Fernandez's well-being, which was exacerbated by the truck breaking down and

requiring additional funds to repair it so it could be operational.

**58.** Mr. Fernandez became desperate for money, not just to pay his debts, but more importantly to get the truck in an operational state so he could make money to start paying those same debts. The business and the truck were losing money. The truck needed repairs and a trailer was needed to complete jobs, which equated to more money. After shouldering the responsibilities of the business and debts alone, his son's failure to follow through was the last straw for Mr. Fernandez. Mr. Fernandez believed that if he could rally enough money, then he could repair the truck, obtain the trailer he needed and get the trucking business off the ground.

**59.** In desperation he reached out to a long-time friend, Jonathan. In his desperation to make Fernandez Son Transportation, LLC, work, Mr. Fernandez turned to the only person whom he had not yet borrowed money from: Jonathan. After a telephone conversation, Mr. Fernandez agreed to meet Jonathan in Mexicali, where Jonathan would take Mr. Fernandez 's truck, load it with the marijuana and return it to Mr. Fernandez. Mr. Fernandez then attempted to reenter the United States and was caught. Mr. Fernandez was apprehended by Customs and Border Protection on or about November 27, 2017, and on May 17, 2018, he pled guilty to one count of importation of controlled substance in violation of 8 USC §§ 952, 960, in exchange for providing the U.S. Attorney's Office information, including Jonathan's full name, his date of birth, telephone number and the details of their arrangement.

**60.**     Mr. Fernandez failed to successfully smuggle the marijuana he agreed to smuggle, and he became a U.S. government informant against Jonathan. Mr. Fernandez 's fears are based on the fact that Jonathan has known Mr. Fernandez and his family for years, as the two go back to high school. Jonathan knows where Mr. Fernandez lives. Unlike Mr. Fernandez, Jonathan has a lot more to lose, his U.S. citizenship and entire drug trafficking operation. Jonathan is a drug trafficking, naturalized U.S. citizen. Mr. Fernandez knows that Jonathan has been smuggling drugs into the United States since he was about 20 years old. Mr. Fernandez 's knowledge and cooperation with the US Government against Jonathan could essentially jeopardize his marijuana operation and his legal status in the US.

**61.**     Mr. Fernandez 's fears became true when his sister, Carolina, observed a strange vehicle outside his home on multiple occasions. It was the fact that he cooperated with the US authorities, snitched on Jonathan, followed by the surveillance at his home that gave rise to Mr. Fernandez fear of returning to Mexico.

**62.**     After completing his sentence, Mr. Fernandez was transferred to the Departmet of Homeland Security custdy arond November 2018. He remains detained since then. On November 14, 2018, Mr. Fernandez was issued a Notice to Appear ("NTA") charging him inadmissible pursuant 8 USC 1182(a)(2)(C) (illicit trafficker of a controlled substance) 8 USC 1182(a)(2)(A)(i)(II) (convicted of a controlled substance offense) At the January 14, 2019 master calendar hearing, Mr. Fernandez, through counsel, admitted the allegations, conceded removability, and

indicated his intention to apply for withholding of removal and relief under CAT. On August 27, 2019, after two hearings, the Immigration Judge ("IJ") denied his request for relief pursuant to 8 USC § 1231(b)(3) finding that Mr. Fernandez was not eligible for such relief and he failed to meet his burden of demonstrating that he will be tortured to merit relief under CAT pursuant to 8 CFR § 1208.16(c).

**63.**     Mr. Fernandez timely filed Form EOIR-26 to appeal the IJ's decision, and filed a brief in support of his appeal. On February 12, 2020, the Board dismissed the appeal. On February 12, 2020, Mr. Fernandez timely filed a Petition for Review to this Court regarding the Board's decision denying his appeal.

**64.**     Mr. Fernandez has a well-founded fear of future persecution by the criminal organizations of Mexico, specifically his friend Johnathan who has already made his threatening presence known.

**65.**     The persecution must be inflicted under government sanction, including persecution by groups "the government is unable or unwilling to control." *See Adebisi v. INS*, 952 F.2d 910, 914 (5th Cir. 1992) (quotation marks omitted). Here, Mr. Fernandez's fear of future persecution is well founded as the Mexican Government's impotency in stopping these criminals is well documented. The administration has even considered designating Mexican drug cartels as Foreign Terrorist Organizations (FTOs).

**66.**     As such, the Mr. Fernandez has a well-founded fear of future persecution. Relocation is also impossible for the Mr. Fernandez and the burden

would be on Respondents to show he can both safety and reasonable relocated. *Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 445 (5th Cir. 2001) ("We have held that '[w]hen a party seeking asylum demonstrates that a national government is the persecutor, the burden should fall upon the INS to show that this government's prospective actions are truly limited to a clearly delineated and limited locality and situation, so that the applicant for asylum therefore need not fear a likelihood of persecution elsewhere in the nation.'")

67. The outbreak of COVID-19, a disease caused by a novel coronavirus, has reached pandemic status. Because COVID-19 is easily transmitted, and because testing is increasingly available, the number of confirmed cases is expected to grow exponentially in the near term. The death toll of COVID-19 in U.S. is growing exponentially. The need for care, including intensive care, and the likelihood of death, is about ten times higher from COVID-19 infection than from influenza.

68. On May 6th, 2020 the urgent warnings of immigration lawyers, human rights activists, health care professionals and the detainees themselves came to a terminal head as Carlos Ernesto Escobar Mejia died in ICE custody. Mr. Escobar Mejia suffered from diabetes and was on a hunger strike protesting the conditions at Otay Mesa Detention Facility. He was vulnerable as are the Petitioners in the instant case, to the wort outcomes of COVID-19.

69. The death of Mr. Escobar Mejia was at the same time preventable and inevitable. Mr. Escobar Mejia had a bond hearing just weeks before his death in

which the IJ declared he needed more time to asses Mr. Escobar Mejia's flight risk. Because of that decision, Mr. Escobar Mejia languished in detention, his status the only thing standing in the way of his ability to live[10].

**70.** All human beings share a risk of contracting, and upon contraction, transmitting the virus that causes COVID-19. Any adult who contracts the virus may experience life-threatening symptoms.

**71.** For those who contract COVID-19 and survive, the virus can severely damage lung tissue, requiring extensive rehabilitation, and even a permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing myocarditis, or inflammation of the heart muscle.

**72.** People of all ages and medical backgrounds have had symptoms including vomiting, severe diarrhea, relentless shivering, and suffocating shortness of breath. Emerging evidence suggests that COVID-19 can also trigger an overresponse of the immune system, further damaging tissues possibly resulting in widespread damage to other organs.

**73.** People can also spread COVID-19 but be asymptomatic. Most people in high risk categories who contract the virus will need advanced support. This level of supportive care requires highly specialized equipment that is in limited supply,

---

[10] https://www.sandiegouniontribune.com/news/immigration/story/2020-05-06/first-ice-detainee-dies-from-covid-19-after-being-hospitalized-from-otay-mesa-detention-center

and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. This level of support is quickly overwhelming local health care resources.

**74.** People who experience serious cases of COVID-19 who do not die from COVID-19 should expect a prolonged recovery, including the need for extensive rehabilitation for profound reconditioning, neurologic damage, and the loss of respiratory capacity.

**75.** There is no vaccine against COVID-19, nor is there any known medication to prevent or treat infection. The only known effective measures to reduce the risk for vulnerable people from injury or death from COVID-19 are to prevent them from being infected in the first place, and to limit spread via social distancing measures (e.g., staying a minimum of 6 feet apart).

**76.** Social distancing or remaining physically separated from known or potentially infected individuals, and vigilant sanitation and hygiene, including repeatedly and thoroughly washing hands with soap and water, are the only known effective measures for protecting vulnerable people from COVID-19.

**77.** In the past weeks, the number of reported cases of infection in many parts of the country have shown a frightening increase. The death toll has similarly skyrocketed, up to over four thousand from just over a hundred two weeks prior.

**78.** Detention centers are tinderboxes for rapid widespread infection within and beyond the facilities. Because of how detention centers necessarily

operate, it is almost inevitable that many will experience an outbreak of COVID-19. New people are introduced frequently into the detained population, exacerbating the risk that the COVID-19 virus will make its way into these facilities.

79.     In order for detention centers to operate, numerous staff, contractors, and vendors also must circulate through the facilities daily. Given the difficulty in accurately identifying people infected with COVID-19, many of whom only have mild symptoms or are asymptomatic, even detention centers that implement screening mechanisms may unwittingly permit contagious individuals inside.

80.     Moreover, the screening procedures performed with respect to detainees – not the many others going in and out of the facilities daily – and include a verbal questionnaire regarding travel, exposure to others with COVID-19 and a screening for fever or respiratory illness. The many vendors and staff and other third parties going in and out of the detention facilities daily are merely temperature checked, which is a woefully inadequate screening measure given how long the virus can remain incubated with infected individuals having no symptoms. It is only a matter of time before COVID-19 infiltrates the Conroe Processing Center – and every detention center in the U.S.

81.     Simply put, immigration detention facilities have a greater risk and likelihood of infectious spread because of crowding, the proportion of vulnerable people detained, and often scant medical care resources. Because COVID-19 is easily spread between people in close proximity, any outbreak will be nearly

impossible for detention centers to control after the COVID-19 virus is introduced. A case in point is the Otay Mesa Detention Center in San Diego, California.[11] Also relevant is the possible spread outside the facility, as has already happened at the Stewart Detention Center in Lumpkin, Georgia.[12]

82. Social distancing measures cannot be implemented in carceral settings, where detained people must share close quarters at almost all times. And given the number of people sharing the same space, keeping surfaces in detention centers adequately sanitized to prevent transmission of COVID-19 is not realistic.

83. People like Petitioners endure inadequate hygiene and sanitation which raises the risk of infection and an outbreak. Toilets, sinks, and showers are shared, without disinfection between each use. Detainees frequently report not having sufficient access to soap. Hand sanitizer, if provided at all, is available only through communal dispensers, which often run empty.

84. Housing quarters are cramped, making social distancing virtually impossible. Food preparation and service is communal with little opportunity for surface disinfection. Detainees must wait in line together to get their meals and cannot sit and eat in a manner that allows for six feet of space in between them. Outside of housing units, detainees also are often clustered together in hallways,

---

[11] https://www.sandiegouniontribune.com/news/immigration/story/2020-04-12/coronavirus-spread-in-otay-mesa-detention-center.)

[12] https://www.wabe.org/more-than-40-employees-at-ga-immigrant-detention-center-test-positive-for-covid-19/?fbclid=IwAR1QIxSLiuLhbleZDaX0H5uPCoXXPW_mqPrfUykpANbf-3c4nToaOBBU8E8

where they are made to wait in line as they are moved between different areas in the facility. Staff arrive and leave on a shift basis, new detainees are introduced into shared environments daily, and there is limited ability, and little effort, to adequately screen staff, contractors, and visitors for new, asymptomatic infection.

85. ICE's belated measures to prevent the spread of COVID-19 within the detention centers fall miserably short of what public health professionals say is required to mitigate the risk to the public at large. Detained people do not have access to masks or gloves or even hand sanitizer, and as stated repeatedly herein, are not able to practice social distancing. To make matters worse, immigration detention facilities lack adequate medical infrastructure to address the spread of infectious disease and treatment of people most vulnerable to illness in detention.

86. If many detainees in a facility contract COVID-19 they will require hospitalization in the community, threatening to overwhelm the community's resources and rendering them unable to provide adequate medical treatment to infected persons. Overwhelming local public health systems will prevent facilities from providing treatment to all who require it, increasing the likelihood that individuals with serious cases will die.

87. Risk mitigation is the only known strategy that can protect vulnerable groups from COVID-19, and ICE has demonstrated over and over again that it is both unwilling and unable to implement meaningful risk mitigation measures. Public health experts advise that reducing the overall number of people

in detention centers will help facilities implement social distancing for those still detained and lessen the burden of protecting the health of detainees and staff.

88. Courts agree that release of high-risk detainees is "absolutely in the public's best interest." *Castillo*, 2020 WL 1502864, at *6; see also *Basank*, 2020 WL 1481503, at *6. Since February, DHS's own medical experts, who have personally investigated numerous detention facilities, have urged swift mitigation measures, including decreasing the number of immigrant detainees in response to COVID-19's risks of harm. Alarmed by ICE's failure to take appropriate action, the experts became whistleblowers, writing to Congress, "regarding the need to implement social distancing to reduce the likelihood of exposure to detainees, facility personnel, and the general public, it is essential to consider releasing all detainees who do not pose an immediate risk to public safety."

89. Immigration judges, prosecutors and attorneys nationwide are in agreement that EOIR's refusal to physically close the courts puts public health at risk. On March 22, the National Association of Immigration Judges (NAIJ), the Immigration and Customs Enforcement Professionals Union and the American Immigration Lawyers Association (AILA) warned that "failure to close all of the nation's Immigration Courts will exacerbate a once-in-a-century health crisis and

lead to a greater loss of life."[13] On March 30, NAIJ reiterated its call for detained courts to close, stating that "there is no safe way to run the detained immigration courts during a pandemic because of the amount of social interactions that the courts require."[14]

**90.** As discussed above, Ms. Valle's bond motion was denied and Mr. Fernandez's parole request is not even acted upon, and the Petitioners have not been released. Moreover, the Petitioners' detention (already 11 and 17 months, respectively, as of the filing of this petition) has no foreseeable end in sight. The threat of COVID-19 only makes their already prolonged detention that much more of a due process violation. As such, the Petitioners have been left with no other recourse other than this petition for a writ of habeas corpus for their immediate release.

## LEGAL AUTHORITIES AND FRAMEWORK

**91.** Respondents have unlawfully detained the Petitioners in the Joe Corley Detention Facility amidst the worst pandemic in modern consciousness. Unless this Court intervenes, they will languish in Respondents' custody for the

---

[13] NAIJ, AILA and ICE Professionals Union, As COVID-19 Rapidly Spreads, So Does Health Risk Created by Keeping the Nation's Immigration Courts Open, March 22, 2020. https://www.naij-usa.org/images/uploads/newsroom/2020.03.22.02.pdf

[14] NAIJ, The National Association of Immigration Judges Urgently Calls for Implementation of Required Health and Safety Measures for the Immigration Courts During the Coronavirus Pandemic, March 30, 2020. https://www.naij-usa.org/images/uploads/newsroom/2020.03.30.01.pdf

duration of their proceedings — which could take months or years — without an opportunity for a neutral arbiter to determine the necessity of their detention.

**92.**    Pursuant to 28 U.S.C. § 2241, Petitioners file this habeas petition on the grounds that their detention is unlawful because they have been denied administrative remedy in spite of the clear and convincing evidence that neither petitioner is a flight risk, nor a danger to their community. Furthermore, Petitioners' continued detention while denied medical treatment for pre-existing vulnerabilities and in a facility incapable of protecting them from COVID-19 presents grave risks to their Right to Due Process. The Petitioners has thus been unconstitutionally held in prolonged detention for 11 and 17 months respectively by the Respondents with no foreseeable end in sight. As such, and as described further herein, this Court has the power to grant a writ of habeas corpus in that the Petitioner is being held in violation of the Constitution per 28 U.S.C. § 2241(c)(3).

**93.**    Petitioner Ms. Valle's case is pending before the BIA and the Petitioner fully intends on pursuing all relief and appeals options available. This would include appealing to the Circuit Courts and requesting a stay. This process could take months or years.

**94.**    As Ms. Valle has no scheduled hearing date, the fate of her decisions rest solely in the hands of the BIA. The BIA operations have also been delayed by the omnipresent COVID-19.  If remanded, the proceedings will have to start all the way from "square one." Absent this court's injunctive relief, Petitioner will face an

almost indefinite stay of detention, confined and exposed while the most intense global pandemic in history unfolds.

95.    Petitioner Mr. Fernandez has just begun the process of a circuit court appeal and request for a stay. This process will take years, especially considering all of the other pressing matters before Circuit Courts in this time of unprecedented logistic and legal confusion. There is absolutely no guarantee, absent this Court's relief, that those decisions will be made before Mr. Fernandez, who is suffering depression, diabetes and herniated disks, falls ill and died of COVID-19.

96.    Continued detention of Petitioners for an indefinite amount of time violates their right to be free of prolonged non-criminal detention without adequate justification and sufficient procedural safeguards, as guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution.

97.    More importantly, Respondents' continued detention of Petitioners has become so prolonged that it is no longer reasonably related to its purpose of effecting removal and therefore violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

98.    Moreover, the Petitioner's detention is unnecessary because they pose no danger to the community (Ms. Valle has no criminal record whatsoever and Mr. Fernandez has one non-violent offense in an otherwise spotless history of residency) and are not flight risks. The Petitioners merely seek the right to preserve their health and fight their asylum case in a non-detained setting, while quarantining

with their sponsors in order to keep themselves and their community safe.

**99.** Due process permits the government to restrain an individual's liberty only where the government's justification for such restraint bears a "reasonable relation" to permissible purposes. *Jackson v. Venezuelana*, 405 U.S. 715, 738 (1972); *see also Foucha v. Louisiana*, 504 U.S. 71, 79 (1992); *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). In the immigration context, those purposes are "ensuring the appearance of [noncitizens] at future immigration proceedings and preventing danger to the community." *Zadvydas*, 533 U.S. at 690 (citations omitted). Those substantive limitations on detention are closely intertwined with procedural due process protections. *Foucha*, 504 U.S. 78-80. Noncitizens such as Ms. Valle have a right to adequate procedures to determine whether their detention serves the purposes of protecting the community or ensuring their appearance. Id. at 49.

**100.** Here, the government can demonstrate neither the necessity of Petitioners' detention nor its use of adequate procedures to arrive at the ongoing decision to confine them. Consequently, ongoing detention violates both their substantive and procedural rights to due process.

**101.** In *Jennings v. Rodriguez*, --- U.S. ----, 138 S. Ct. 830 (2018) the U.S. Supreme Court remanded to the Ninth Circuit to address the constitutional question—whether due process itself permits for prolonged detention of a noncitizen. The Ninth Circuit has, post-Jennings, expressed "grave doubts that any statute that allows for arbitrary prolonged detention without any process is

constitutional or that those who founded our democracy precisely to protect against the government's arbitrary deprivation of liberty would have thought so." *Rodriguez v. Marin*, 909 F.3d 252, 256 (9th Cir. 2018).

**102.** In *Alexis v. Sessions,* CIVIL ACTION NO. H-18-1923 (S.D. Tex. Nov. 13, 2018), the court in the Southern District of Texas granted a habeas petition on the grounds that *Jennings v. Rodriguez* did not authorize indefinite detention. (See *Jennings*, 138 S. Ct. at 852; see also *Maldonado v. Macias*, 150 F. Supp. 3d 788, 805 (W.D. Tex. 2015) ("civil detention of aliens is subject to a reasonable time limitation"); see also *Rosales – Garcia v. Holland* , 322 F.3d 386, 412 (6th Cir.2003) (en banc) (explaining that "constitutional concerns ... compel us to construe IIRIRA's post-removal-period detention provision to contain a reasonableness limitation").)

**103.** Moreover, in *Zadvydas v. Davis*, 533 U.S. 678, 696 (2001), the Supreme Court noted that "basic purpose" of immigration detention was to "assur[e] the alien's presence at removal," and that this basic purpose would not be served by detaining aliens whose removal was not "reasonably foreseeable." Id. at 699. The Court decided the case in favor of the aliens on statutory grounds, but noted that the detention statute would "raise a serious constitutional problem," if it operated to "authorize long-term detention of unremovable aliens." Id. at 697, 690.

**104.** Due process requires that the nature and duration of noncriminal confinement bear "some reasonable relation to the purpose for which the individual

is committed." Jackson v. Case 4:20-cv-01241 Document 1 Filed on 04/08/20 in TXSD Page 22 of 32 23 Indiana, 406 U.S. 715, 738 (1972); Brown v. Taylor, 911 F.3d 235, 243 (5th Cir. 2018). The only legitimate purpose, consistent with due process, for federal civil immigration detention is to prevent flight risk and ensure the detained person's attendance for a legal hearing adjudicating their status or potential removal, or to otherwise ensure the safety of the community. *Zadvydas*, 533 U.S. at 699.

**105.**   In the very recent case of *Ali v. DHS et al.,* which is out of this district, this Court granted the release of a Pakistani National subject to a final order of removal on the grounds that since his removal was no longer possible, his detention no longer served its intended purpose and was thus unreasonable.  See *Ali v DHS et al.,* 4:20-cv-00140 ECF No. 37 (S.D. Tx Apr. 2nd, 2020) at 6. ("With no significant likelihood of removal in the foreseeable future, Petitioner's detention, the sole purpose of which was to effectuate imminent removal, no longer serves its intended purpose, and thus, is unreasonable")

**106.**   In light of the understandable global caution against air travel and Petitioners' prospect of a year or more in appeal processes, there is similarly no "significant likelihood that the Government will be able to remove Petitioners to [Honduras/Mexico] in the foreseeable future."  It could be similarly concluded that under 8 U.S.C. § 1231 (a)(6) and *Zadvydas,* such unreasonable detention is unauthorized.

**107.** In addition, "[n]early all district courts that have considered the issue agree that 'prolonged mandatory detention pending removal proceedings, without a bond hearing, 'will—at some point—violate the right to due process.'" *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1116 (W. D. Wash. 2019) (citing cases); see also *Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *11-*12 (S.D.N.Y. May 23, 2018) (granting relief because the alien had been confined for 8 months, prolonged by the government's failure to process and send documents to his counsel).

**108.** In addition to the Petitioners' prolonged indefinite detention through no fault or delay of their own, their continued detention during the COVID-19 pandemic compounds the due process violations even more so. Respondents' unnecessary prolonged continued detention of the already traumatized Petitioners and puts them at risk of exposure to a highly contagious disease. Ms. Valle has recently caught the flu and has had a fever, compromising her immune system. She has also suffered severe psychological stress and trauma. Mr. Fernandez is a diabetic and depressive, who has been deprived of his life saving medication. By placing these vulnerable people in the path of a rapidly escalating pandemic – indeed by housing them together in close quarters – Respondents are violating their due process rights under the Fifth Amendment.

**109.** Immigration detainees, even those with prior criminal convictions, are civil detainees whose constitutional protections while in custody derive from

the Fifth Amendment due process clause. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Civil detainees, however, are entitled to greater rights than convicted prisoners or criminal pretrial detainees. *Jones v. Blanas*, 393 F.3d 918, 933–34 (9th Cir. 2004), cert. denied, 546 U.S. 820 (2005); see also *King v. Cnty. of Los Angeles*, 885 F.3d 548, 557 (9th Cir. 2018) (finding presumption of punitive, and thus unconstitutional, treatment where conditions of confinement for civil detainees are similar to those faced by pre-trial criminal detainees). The constitutional protections to which civil immigration detainees are entitled are more comprehensive than those afforded to imprisoned people.

**110.** Even the Eighth Amendment imposes on the government an affirmative duty to provide conditions of reasonable health and safety to those it detains or incarcerates. "When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). As a result, the government must provide those in its custody with "food, clothing, shelter, medical care, and reasonable safety." *Id.* at 200. The Eighth Amendment requires that "inmates be furnished with the basic human needs, one of which is 'reasonable safety.'" *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (quoting *DeShaney*, 489 U.S. at 200).

**111.** The Supreme Court has explicitly recognized that the risk of

contracting a communicable disease may constitute such an "unsafe, life-threatening condition" that threatens "reasonable safety." Id. While the Eighth Amendment prohibits punishment that is "cruel and unusual," the Due Process Clause of the Fifth Amendment prohibits any punishment at all. Conditions that would violate the Eighth Amendment rights of a criminal prisoner are more than enough to violate the Fifth Amendment due process rights of a civil detainee. Unlike an Eighth Amendment claim, there is no requirement for civil detainees to prove "deliberate indifference" of government officials in order to establish a violation.

**112.** Conditions of confinement violate the Fifth Amendment when they deprive people in civil custody of a basic human need, including safety, and the risk of deprivation cannot be justified by a legitimate governmental interest or is excessive despite a legitimate governmental interest. The conditions of Petitioner's prolonged confinement (especially under the current circumstances) violate Petitioner's due process rights.

**113.** Even as this public health crisis rapidly develops, courts throughout the country have already recognized that continued confinement, particularly of vulnerable populations, in the face of COVID-19 raises serious due process concerns. See e.g., *Dada v. Witte,* No. 1:20-cv-00458-DDD-JMP, ECF No. 17 at *2 ("Petitioners have established that their detention poses a grave and unconstitutional risk while failing to meaningfully serve ICE's of the public's interest."); *Gayle v. Michael Meade et al,* No. 1:20-cv-21553-MGC ECF No. 76 at

*6 ("Thus, to the extent that ICE fails to commit to addressing the conditions complained of, ICE has demonstrated deliberate indifference"); *Castillo*, 2020 WL 1502864, at *5 ("Under the Due Process Clause, a civil detainee cannot be subject to the current conditions of confinement at Adelanto."); *Basank*, No. 20-cv-02518, ECF No. 11, at 13 ("Confining vulnerable individuals such as Petitioners without enforcement of appropriate social distancing and without specific measures to protect their delicate health 'pose[s] an unreasonable risk of serious damage to [their] future health,' and demonstrates deliberate indifference.") (quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002)); *Thakker*, No. 20-cv-00480, ECF No. 47, at 22 ("Physical detention itself will place a burden on community healthcare systems and will needlessly endanger Petitioners, prison employees, and the greater community. We cannot see the rational basis of such a risk."); *United States v. Martin*, No. CR PWG-19-140-13, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020) ("[T]he Due Process Clauses of the Fifth or Fourteenth Amendments, for federal and state pretrial detainees, respectively, may well be implicated if Respondents awaiting trial can demonstrate that they are being subjected to conditions of confinement that would subject them to exposure to serious…illness.").

**114.** The Court's authority to order Petitioners' release to ensure their constitutional rights are protected is well-established. "Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights." *Stone v. City & Cnty. of San Francisco*, 968

F.2d 850, 861 (9th Cir. 1992); see also *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). "When necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

**115.** Courts have regularly exercised this authority to remedy constitutional violations caused by overcrowding. *Duran v. Elrod*, 713 F.2d 292, 297–98 (7th Cir. 1983), cert. denied, 465 U.S. 1108 (1984). The same principle applies here. As the constitutional principles and public health experts make clear, releasing Petitioners is the only viable remedy to ensure their safety as well as the safety of other detainees in light of the health threat that COVID-19 poses.

**116.** In the face of this threat, social distancing and hygiene measures are Petitioner's only defense against COVID-19. Respondents' actions make such protective measures impossible in the environment of an immigration detention center, where employees and vendors and other third parties go in and out with inadequate screening taken for a virus that lies dormant, is very contagious and has the potential to be deadly. Petitioner shares toilets, sinks, and showers, eats in communal spaces and is in close contact with the many other detainees and officers around her. It is only matter of time before the Joe Corley Detention Facility is infiltrated by COVID-19, if it has not been already.

**117.** Respondents are subjecting Petitioners, medically vulnerable individuals with family ties to the United States and strong characters to

unreasonable harm from their continued 11 and 17-month prolonged detentions which have no end in sight. Release is the only effective remedy to protect the well-being of not only Petitioners and other detainees but of the community of Conroe at large. If COVID-19 is allowed unmitigated spread in the detention centers, the local medical facilities and hospitals will ultimately become overburdened and unable to provide care for all infected. The release of the Petitioners, and as many detainees as possible, is the only possible remedy.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violation of Fifth Amendment Procedural Due Process**
**(Right to a Hearing)**

**118.** Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**119.** Respondents' continued detention of Petitioners without a hearing to determine whether their prolonged detention is justified violates their right to be free of prolonged non-criminal detention without adequate justification and sufficient procedural safeguards, as guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution.

### SECOND CAUSE OF ACTION
**Violation of Fifth Amendment Substantive Due Process**
**(Prolonged Detention; Unlawful Punishment; Freedom from Cruel Treatment and Conditions of Confinement; Denial of Reasonable Safety)**

**120.** Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**121.** Constitutional due process concerns with prolonged detention apply to aliens in removal proceedings. Though the Court in *Demore v. Kim*, 538 U.S. 510 (2003), permitted mandatory detention of aliens convicted of certain crimes for five months during their removal proceedings, Justice Kennedy noted that even mandatory detention for criminal aliens would violate due process "if the continued detention became unreasonable or unjustified." *Demore v. Kim*, 538 U.S. 510, 532 (Kennedy, J., concurring).

**122.** Ms. Valle has been subject to the flu and fever while detained in the custody of Respondents. She has not been allowed to take the medication she needs from her facial paralysis. While not part of the classes recognized as vulnerable, Ms. Valle is distinctly vulnerable to COVID-19 as her system has spent its time fighting illness and being weakened by the psychological pressures of her 11-month detention.

**123.** Mr. Fernandez currently suffers from diabetes, depression and slipped disks. His prolonged detention has made it impossible for him to receive any of the proper medication for his physical or mental illnesses. Depression and Diabetes are both among the categories of recognized vulnerabilities to COVID-19.

**124.** Ms. Valle has currently been detained for over eleven months, Mr. Fernandez for 17. Petitioners both have cases with pending decisions and are nowhere near final decisions with regards to their appeals. Indeed, due to COVID-19, all immigration court cases are delayed more than they usually are – and there

is already a considerable delay.

**125.** As referenced above, in *Ali v. DHS et al.* this Court granted the release of a Pakistani National subject to a final order of removal on the grounds that since his removal was no longer possible, his detention no longer served its intended purpose and was thus unreasonable. See *Ali v DHS et al.,* 4:20-cv-00140 ECF No. 37 (S.D. Tx Apr. 2nd, 2020) at 6. ("With no significant likelihood of removal in the foreseeable future, Petitioner's detention, the sole purpose of which was to effectuate imminent removal, no longer serves its intended purpose, and thus, is unreasonable")

**126.** There is no significant likelihood of removal in the instant case. Ms. VALLE currently has an appeal pending with the BIA and fully intends to appeal the decisions if they are not in her favor while Mr. FERNANDEZ has just begun a lengthy Petition for Review and a Stay of Removal. Furthermore, if these cases are remanded, Petitioners would be made to start their immigration proceedings *de novo*. Both of these outcomes imply a course of at least a year, implying Petitioners' detention no longer serves its intended purpose and is thus unreasonable.

**127.** Respondents' continued detention of Petitioners has become so prolonged (and also dangerous in light of COVID-19) that it is no longer reasonably related to its purpose of effecting removal and therefore violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

**128.** The Fifth Amendment to the U.S. Constitution also guarantees that

civil detainees, including all immigrant detainees, may not be subjected to punishment. The federal government violates this substantive due process right when it subjects civil detainees to conditions of confinement that amount to punishment or create an unreasonable risk to detainees' safety and health.

129. Respondents' conditions of confinement subject the Petitioners to heightened risk of contracting COVID-19, for which there is no vaccine, known treatment, or cure. In addition to the prolonged detention of the Petitioners for 10 and 17 months respectively with no end in sight, the Respondents are subjecting the Petitioners to a substantial risk of serious harm, including severe illness and death.

## THIRD CAUSE OF ACTION
### Violation of Immigration and Nationality Act
### (Arbitrary and Capricious Denial of Relief)

130. Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

131. In the case of Ms. Valle, Respondents' continued detention of the Petitioner and their failure to apply the appropriate legal standards in determining whether to release her on bond is arbitrary and capricious in contravention of 8 U.S.C. § 1182(d)(5), 8 C.F.R. 212.5, and Immigration and Nationality Act 236(a).

132. In the case of Mr. Fernandez, Respondent's continued detention of the Petitioner and their failure to apply the appropriate legal standards in determining whether to release him on parole is arbitrary and capricious in contravention of 8 U.S.C. § 1182(d)(5), 8 C.F.R. 212.5, and any other authorities

that authorize Respondents' parole authority.

**133.** Moreover, since the decision on the respective reliefs of the Petitioners were denied, there have been confirmed reports of COVID-19 in the Joe Corley Detention Facility. Because social distancing is inherently impossible in the detention centers and because COVID-19 has proven so incredibly contagious, COVID-19 will spread like wildfire within the detention center.

**134.** There is no vaccine for COVID-19, it is extremely contagious, and it can be deadly. These factors combined with Petitioner's unlawful prolonged detention of an indefinite amount of time as well as Petitioner's trauma-based psychological conditions all mitigate in favor of the Petitioner's immediate release.

**135.** On March 23, 2020, the Ninth Circuit ordered, sua sponte and without further explanation, the release of an immigration petitioner "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers." *Xochihua-Jaimes v. Barr*, 2020 WL 1429877, No. 18- 71460 (9th Cir. Mar. 23, 2020).

**136.** As such and in light of the foregoing, it is an abuse of discretion to refuse to release the Petitioners in light of such continued detention clearly being against the public interest.

///

///

///

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully prays that this Court:

(1) issue a writ of habeas corpus and order the immediate release of the Petitioners, with appropriate precautionary public health and safety measures, on the ground that their continued detention violates the Due Process Clause of the Fifth Amendment;

(2) in the alternative, issue an Order to Show Cause against Respondents as to why the Petitioners should not immediately be released with precautionary measures;

(3) in the alternative, this Court schedule a telephonic bond hearing for the Petitioners in which the Respondents must prove by clear and convincing evidence that the Petitioners pose a flight risk or danger to the community, with the Petitioners being released in the interim if such bond hearing is not able to occur immediately;

(4) in the alternative, issue injunctive relief ordering Respondents, their officers, agents, employees, attorneys and contractors to immediately release the Petitioners, with appropriate precautionary measures, on the grounds that their continued detention violates the Due Process Clause of the Fifth Amendment;

(5) issue an order providing for an award of attorney's fees and costs; and

(6) issue an order providing for such other relief as may be just and reasonable.

///

///

///

Dated: May 7, 2020          Respectfully submitted,

/s/ Bashir Ghazialam
* Bashir Ghazialam, Esq., CASBN 212724
LAW OFFICES OF BASHIR GHAZIALAM
P.O. Box 928167
San Diego, California 92192
Phone (619) 795-3370
Facsimile (866) 685-4543
Email bg@lobg.net

Dated: May 7, 2020          /s/ Bertha A. Zuniga
Bertha A. Zuniga, Esq.
ZUNIGA LAW, PLLC
2619 McCullough Ave.
San Antonio, TX 78212
Phone 210-900-8000
Facsimile 210-579-7293
Email bazunigalaw@gmail.com

*Motion for pro hac vice admission
forthcoming

Attorneys for Petitioner